UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                                              Case No. 10-13778-LMI
                                                                    Chapter 7
    Cristina Josephina Pertierra,

    Debtor,
_____/
Barry E. Mukamal, as TRUSTEE,

    Plaintiff,

-vs-

Cristina Josephina Pertierra,                                       Adv. Proc. No. 11-01855-LMI

    Defendant.
_____/

### PLAINTIFF'S CLOSING ARGUMENT

    Comes Now, Plaintiff, Barry E. Mukamal as Chapter 7 Trustee of the Bankruptcy Estate of Christina Josephina Pertierra by and through undersigned counsel, and files and serves this the *Plaintiff's Closing Argument*, and states the following in support thereof:

1. Debtor (Cristina Josephina Pertierra) filed a voluntary petition in bankruptcy under Title 11 of the United States Code on the 17th day of February, 2010. PE#3.[1]

2. The Trustee sued the Debtor to deny her discharge pursuant to 11 U.S.C. §§ 727(a)(2) (intent to defraud the Trustee or estate), (3) (failure to keep or preserve recorded information from which Debtor's financial condition or business transactions may be ascertained), (4)(A) (false oath), (4)(D) (withholding of records relating to the debtor's property or financial affairs) and (a)(5)

---

[1] "PE" shall refer to the Plaintiff's Exhibit and number; and "DE" shall refer to the Defendant's Exhibit and letter/number.

1

(failure to explain satisfactorily the loss of assets or deficiency of assets).

3. Of primary focus at trial was the Debtor's lack of veracity and credibility, as exemplified in the numerous false mortgage applications from which she obtained millions of dollars in cash proceeds over the years pre-petition, and the Debtor's simply nonchalant attitude regarding her records evidencing the receipt and disposition of these monies over the years.

4. The Debtor has been a licensed attorney since December 10th, 1996 (see PE#6).

5. Debtor testified at trial and examination that, when she practiced, she owned a real estate title company, and also performed closings for numerous real estate transactions. See PE#8 at p.19

6. Debtor also testified at trial, and previously, that she performed legal services in the areas of wills, trusts, estate planning, real estate and contracts. See e.g., PE#7 at p.7; PE#8 at pp.6, 19.

7. It was evident at trial that the Debtor was quite reckless in her bankruptcy filing, her record keeping and her concerns regarding the fact that the loan applications she submitted to various federal insured financial institutions were materially false – though she obtained millions of dollars in mortgages from these institutions, and that at the time of borrowing, and re-borrowing, she knew she did not have the wherewithal to pay same back. See, e.g., PE#8 at pp.36 ("just signed" documents without verifying truth therein).

8. Non-exclusive examples of how far the Debtor would go to perpetrate fraud on this Court, the public, and financial institutions was reflected over and over again in the exhibits and her testimony at trial; as well as her apparently purposeful destruction of her personal records regarding her financial condition and disposition of substantial sums of monies over the years.

9. Specifically, Debtor listed as her address at the time of the Petition that she lived at 937 Sunset Drive, Miami, FL ["Homestead"]; but,

her driver license, which she had renewed (for eight years) in February, 2010 reflected her address as 5770 Estero Blvd., Ft. Myers, FL (*see* PE#5) ["Estero Property"].[2]  Debtor testified that she never resided at the Estero Property, and she even changed her address to the Homestead address, post-petition in July, 2011 (see PE#5, reflecting "replacement"). *See, e.g.*, PE#8 at p.29.  Debtor testified that she used the Estero Property address on her driver license so she could obtain better automobile insurance costs (deceive the insurance carrier) – though she disavowed this property ever being her residence.

10. Debtor also misled everyone in her schedules regarding the Estero Property itself, -- which she also testified she has not owned since 2007 (*see* PE#8 at pp.8-9), and the transfer of which (*see* PE#15.A.) was made in May 2008 (within two years pre-petition) and not disclosed in her Statement of Financial Affairs at Question No. 10.  More specifically, Debtor listed "5770 Estero Boulevard" as the property, but in reality there were two (2) properties, 5770 and 5774 Estero Boulevard, and they were multifamily, not single family as Debtor falsely identified in her Schedules.  *Compare*: PE#3 at Schedule A; PE#8 at pp.7-8 (referring to it as "multi-family"), 12-13 (referring to it as a "Duplex"); PE#14.C. at Bate Stamp 0000320 (referring to it as "2-Family").

11. Interestingly, as late as May, 2007, Debtor had identified that she also had $230,409.00 sitting in four (4) different bank accounts – however, Debtor never produced a single document at trial evidencing these accounts and the disposition of these substantial sums of money.  *See* PE#14.C. at Bate Stamp 0000323.

---

[2] Debtor's earlier Driver License also reflected the Estero Property address for the one issued December 24th, 2003 as well.  *See* PE#14.C. at Bate Stamp 0000328.  Debtor's spouse's Driver License also reflected the Estero Property as their residence in the license issued December 14th, 2004 (*see* PE#14.C. at Bate Stamp 0000329). The Estero Property was also used as Debtor's residence for each loan application for the Estero Property (*see, e.g.* PE#15.C. at Bate Stamp 0000427).

12. Debtor simply refused to obtain copies of the records she would be able to obtain reflecting the receipt and disposition of these millions of dollars. *See, e.g.*, PE#8 at p.43

13. Debtor also had, as of the Petition date, a watch; but, as of the time of her 2004 Examination in November, 2010, she had sold same on Ebay, and amazingly, she had no records reflecting such sale on Ebay. *See* PE#7 at pp.30-31.

14. It is obvious Debtor would go to any length to avoid discovery of the disposition of these monies form the financings she did on her Homestead and the Estero Property, and would go to any length to also obtain these monies by make false applications for same.

15. Debtor's joint (with her spouse) US Income Tax Returns reflected the following income:

| Year | Adjusted Gross Income | PE# |
|---|---|---|
| 2004 | $73,475.00 | 9 |
| 2005 | $41,099.00 | 10 |
| 2006 | $24,438.00 | 11 |
| 2007 | $497.00 | 12 |
| 2008 | $13,972.00 | 13 |

16. Debtor and her spouse applied for a mortgage on their Homestead in May or June, 2007 for $525,000.00 (see PE#14.A.), and submitted a joint Uniform Residential Loan Application (PE#14.C.) ["2007 URLA"]. In the 2007 URLA, Debtor falsely represented that: her husband was employed by her own law firm (PE#14.C at Bate Stamp 0000318); the she earned $25,000.00 per month, and her spouse earned $55,000.00 per month (PE#14.C. at Bate Stamp 0000319).  In her Rule 2004 Examination (PE#7), conducted November 19, 2010, Debtor testified that she had no records as to what she did with: $141,000.00 from a Home Equity Line of Credit in 2007 from her Homestead (PE#7 at pp.23-24); approximately $600,000.00 in cash she received from a refinancing of the Estero Property in 2006; $200,000.00 in cash from refinancing in 2004; nor

4

        $475,000.00 from a Home Equity Line of Credit in 2003 on the Estero Property (*see* PE#7 at p.22; PE#8 at p.9)).

17. Debtor also testified at trial, and in her Rule 2004 Examination, that she obtained cash advances on her credit cards, within a few years of filing bankruptcy, totaling over $150,000.00+, and had no records evidencing the use or disposition of these substantial sums. See PE#7 at pp. 34-35.

18. Finally, Debtor produced a hand-written note (PE#18) of her "believed-to-be" disposition of the proceeds from the multiple refinancing(s); and that same was made from her memory (as testified to at trial). However, even assuming this document (PE#18) were accurate, it still does not explain and show the disposition of the credit card cash advances of over $150,000.00 in the few years leading up to bankruptcy, nor the disposition of the $209,000.00+ she identified in her 2007 URLA.

19. Quite simply, Debtor showed sharp practice and gamesmanship in her obtaining the millions of dollars in loan financing for her Homestead and Estero Property, refused to produce documents or obtain same reflecting the disposition of these monies, and otherwise acted without regard to the effect of this reckless activity, all while being a duly-admitted attorney to the Florida Bar. Debtor produced at trial no bank statements with substantial sums evidencing the disposition of these monies, nor credit card statements, or other records of reasonable reliance to verify Debtor's verbal assertions of the hypothesized disposition of these monies.

20. Quite simply Debtor's discharge should be denied for the falsity of her testimony, the failure to maintain appropriate records reflecting her disposition of no less than $600,000.00 she received in May, 2006, $141,000.00 she received in 2007, and the $209,000.00 in bank accounts she had as of May 2007.

5

MEMORANDUM

A.  § 727(a)(3)

Section 727(a)(3) provides that a court shall grant a debtor his discharge unless—

> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which he debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]
> -------------------------------

The purpose of Section 727(a)(3) is "to give creditors and the bankruptcy court complete and accurate information concerning the status of a debtor's affairs and to test the completeness of the disclosure requisite to a discharge." *In re Greene,* 340 B.R. 93, 98 (Bankr.M.D.Fla.2006) (citing *PNC Bank v. Buzzelli (In re Buzzelli),* 246 B.R. 75, 95 (Bankr.W.D.Pa.2000) (citing *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3rd Cir.1992)). Whether a debtor's failure to retain records was justified must be determined in light of all the circumstances of the case. *In re Young,* 346 B.R. at 610 (citing *Christy v.Kowalski (In re Kowalski),* 316 B.R. 596, 603 (Bankr. E.D.N.Y. 2004); *see also In re Cox,* 904 F.2d 1399 (9th Cir. 1990).

"In determining sufficiency of records pursuant to Code Section 727(a)(3), perfection in record keeping is not required but creditors examining the records of the debtor must be reasonably able to follow the debtor's business transactions, make intelligent inquiry, verify the oral statements and explanations of the bankrupt, and ascertain the present and past financial condition of the bankrupt within substantial completeness and accuracy. *In re Hirsch,* 14 B.R. 59 at 62 (Bkrtcy.S.D.Fla.1981). See also *In Re Waldroop,* 22 B.R. 284 (Bkrtcy.D.N.M.1982)." *In re Savel*, 29 B.R. 854, 856 (Bankr. S.D. Fla. 1983). Attorneys and other professionals are held to a much higher standard for record keeping purposes. *See In re Leffingwell*, 297 B.R. 328, 356 (Bankr. M.D. Fla. 2002).

This Debtor was, and is, a sophisticated attorney who has practiced for years as a real estate and estate planning attorney with her very own title company. Debtor understands the importance of maintaining records in her businesses, and that the Trustee has reputedly requested the documents evidencing the disposition of these substantial sums of money in the few years leading up to the bankruptcy case. The

Debtor here does not even produce a single document showing this substantial sum of money in any bank account, let alone a cancelled check or wire transfer showing the disposition of same.

It is beyond argument that this Debtor simply thumbed her nose at the bankruptcy system, and as well as the mortgage industry. Debtor simply refused to go out and gather the documents she was obligated to maintain in order to show the Court, and the Trustee what she did with over $1,000,000.00 in cash from refinancing, credit card advances and bank accounts in 2006 and 2007  Simply shrugging her shoulders and saying "oh well" and recklessly signing financing documents, as well as apparently her own bankruptcy schedules, reflected an intent to deceive and hinder the Trustee in administering this Estate, an same should not be condoned by this Court. The challenge in this matter was to find out what happened with all of this money within just a few years of the Petition date, and not a shred of documentation was ever provided, other than the self-serving hand-written note of the Debtor's memory of the disposition of some of the millions she bilked from the banks for her real estate holdings; and a few of her mortgage statements for one of her properties showing payment of some of the mortgage obligations over a short span of time, without records showing where these payments came from.

This Debtor knew she had an obligation to retain these records and amazingly, she made no effort to gather them and submit them for trial purposes, and instead chose to relay on a questionable recollection from memory, while disavowing knowledge of the contents of her multiple false uniform loan applications to the lenders who provided the

Therefore, Debtor's discharge should be denied pursuant to § 727(a)(3).

### B.  § 727(a)(5)

Additionally, the Trustee seeks denial of the Debtor's discharge pursuant to § 727(a)(5) for failure of the Debtor to satisfactorily explain the loss or disposition of the assets (the substantial monies received from the refinancing in 2006 and 2007, the bank monies set forth in her 2007 URLA and the credit card cash advances).

Section 727(a)(5) mandates that "it is the Plaintiff's burden to establish that the Debtor had [an] interest in a property of some substance not too far removed from the date of

7

the commencement of the case and on the date of the commencement of the case, he no longer had that property and when the Debtor was called upon to explain the non-existence of the property, he was unable to furnish a satisfactory explanation." *Insurance Co. of North America v. White (In re White),* 177 B.R. 110, 115 (Bankr.M.D.Fla.1994); *In re Hawley*, 51 F.3d 246, 249 (11th Cir. 1995). Once the Trustee identifies the lost assets, the burden shifts to the Debtor to provide a satisfactory explanation of the loss. *In re Yanni,* 354 B.R. 708, 716 (Bankr. E.D. Pa. 2006).

In the matter at bar, it is beyond argument that the Debtor had, within a short period from mid-2006 through mid-2007 at least $1,000,000.00 in cash she had received or which was sitting in multiple bank accounts, and has provided insufficient proof of the whereabouts or disposition of these monies.

Therefore, as a matter of law, the Debtor's discharge should be denied.

## CONCLUSION

Although only addressing for purposes of the Closing Argument these two (2) bases to deny the Debtor's general discharge, the Trustee does not concede the other bases he sought relief for; but believes the Court directed the parties to limit their argument to ten (10) pages. The Debtor's discharge should therefore be denied.

**I HEREBY certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).**

I HEREBY CERTIFY that a true and correct copy of this pleading was served via ecf in pdf format upon filing same with the Court on October 10th, 2012 upon: Emmanuel Perez, Esq.

Respectfully submitted this 10th day of October, 2012.

Plaintiff's/Trustee's Counsel
19 West Flagler Street, Suite 416
Miami, FL 33130
Telephone: (305) 374-0200
Facsimile: (305) 374-0250

By:_____/s/_____
JAMES B. MILLER
Fla. Bar No. 0009164

8